IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Marisa Alexandria Lyles, | ) | C/A No.: 1:14-2042-RMG-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | REPORT AND RECOMMENDATION |
| Commissioner of Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This appeal from a denial of social security benefits is before the court for a

Report and Recommendation ("Report") pursuant to Local Civ. Rule 73.02(B)(2)(a)

(D.S.C.). Plaintiff brought this action pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3) to

obtain judicial review of the final decision of the Commissioner of Social Security

("Commissioner") denying her claim for Supplemental Security Income ("SSI"). The two

issues before the court are whether the Commissioner's findings of fact are supported by

substantial evidence and whether she applied the proper legal standards. For the reasons

that follow, the undersigned recommends that the Commissioner's decision be reversed

and remanded for further proceedings as set forth herein.

I.      Relevant Background

        A.      Procedural History

        On April 9, 2010, Plaintiff filed an application for SSI in which she alleged her

disability began on January 1, 1992. Tr. at 225–30. Her application was denied initially

and upon reconsideration. Tr. at 126–130, 131–32. On November 20, 2012, Plaintiff had

a hearing before Administrative Law Judge ("ALJ") Todd D. Jacobson. Tr. at 36–76 (Hr'g Tr.). The ALJ issued an unfavorable decision on January 25, 2013, finding that Plaintiff was not disabled within the meaning of the Act. Tr. at 14–34. Subsequently, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner for purposes of judicial review. Tr. at 4–7. Thereafter, Plaintiff brought this action seeking judicial review of the Commissioner's decision in a complaint filed on May 23, 2014. [ECF No. 1].

B.    Plaintiff's Background and Medical History

1.    Background

Plaintiff was 25 years old at the time of the hearing. Tr. at 28. She received a special education certificate, but later obtained a diploma through adult education. Tr. at 42. She had no past relevant work ("PRW"). Tr. at 68. She alleges she has been unable to work since January 1, 1992. Tr. at 225.

2.    Medical History

James K. Phillips, III, Ph.D. ("Dr. Phillips"), and Deborah L. Gladden, M.S., SSP, NCSP ("Ms. Gladden"), evaluated Plaintiff in March and April 1998. Tr. at 489–90. Dr. Phillips and Ms. Gladden indicated Plaintiff presented a complicated picture because she functioned within the average range in terms of conversation, relating style, and adaptive behavior. Tr. at 489. Plaintiff had achievement scores on the Woodcock-Johnson Psychoeducational Battery–Revised that ranged from 70 to 108 and were "approximately commensurate with the observational estimate of intellectual capacity." *Id.* However, Plaintiff's scores on the Wechsler Intelligence Scale for Children–III ("WISC–III"), the

formal measurement for cognitive capacity, ranged from 58 to 69. *Id.* Dr. Phillips and Ms. Gladden indicated the discrepancy was the result of Central Auditory Processing Disorder, sensory integration problems, frustration, and performance anxiety. *Id.*

On July 7, 2006, Plaintiff presented to Piedmont Medical Center for a mental health evaluation. Tr. at 380. She complained of depressed mood, poor impulse control, sadness, anger/irritability, sleep disturbance, and feelings of guilt. Tr. at 391. Plaintiff stated she had yelled at a friend and family members. Tr. at 381. Plaintiff's mother indicated that Plaintiff had previously kicked out her windshield in anger and that she had recently kicked and slammed a door and thrown a phone. Tr. at 390. Plaintiff was instructed to follow up with Delfin F. Valite, M.D. ("Dr. Valite") the following morning. Tr at 383.

Plaintiff presented to Dr. Valite on April 7, 2009, and denied anxiety, depression, mania, obsessive thoughts, and symptoms of psychosis. Tr. at 423. Plaintiff was compliant with her medications and her behavior was stable and unremarkable. *Id.* Dr. Valite indicated a diagnosis of "bipolar I, most recent episode depressed severe." *Id.*

On August 28, 2009, Plaintiff and her mother presented to Dr. Valite. Tr. at 422. Plaintiff's mother reported her to be "poorly compliant" with her medications and to lack motivation and spend most of her time in front of the television. *Id.* She indicated Plaintiff procrastinated instead of performing her chores and relied on her family members for activities of daily living. *Id.* She noted Plaintiff became argumentative and oppositional when reminded to take medications or to engage in personal hygiene activities. *Id.* Dr. Valite indicated "in my opinion, she is a poor candidate to living

3

independently and because of her mental illness and possible learning disability, she may not be able to keep a job that can sustain independent living." *Id.*

On November 19, 2009, Dr. Valite indicated Plaintiff was doing well. Tr. at 421. Plaintiff's mood was described as euthymic and stable and she denied symptoms of anxiety and psychosis. *Id.* Plaintiff reported taking her medication regularly and her behavior was stable. *Id.*

On April 16, 2010, Dr. Valite indicated Plaintiff showed a partial treatment response. Tr. at 420. Dr. Valite noted that Plaintiff's mother and grandmother had expressed concern over Plaintiff's perceived lack of motivation to stay healthy and concern for her personal hygiene. *Id.* Plaintiff reported significant arguments and misunderstandings with her mother. *Id.* Dr. Valite described Plaintiff as having a euthymic and stable mood. *Id.* Plaintiff denied symptoms of psychosis and anxiety. *Id.* Her self-care skills were impaired and she required assistance or cues to perform self-care. *Id.* She reported outbursts of anger and impulsive behavior. *Id.* Dr. Valite indicated a diagnosis of "bipolar I, most recent episode depressed severe." *Id.*

On May 5, 2010, Dr. Valite wrote a letter indicating he had treated Plaintiff since July 2006 for bipolar disorder. Tr. at 426. Dr. Valite indicated Plaintiff was not emotionally stable. *Id.* He indicated that Plaintiff was "totally disabled and unable to work at this time or for the next 12 months." *Id.*

On June 29, 2010, Plaintiff attended a psychological consultative evaluation with A. Nicholas DePace, Ph. D. ("Dr. DePace"). Tr. at 427–31. Dr. DePace noted that Plaintiff appeared to put forth good effort and concluded that the test results obtained

4

were felt to represent an accurate assessment of her level of functioning. Tr. at 429. On the Wechsler Adult Intelligence Scale–Fourth Edition ("WAIS–IV"), Plaintiff obtained a full scale IQ score of 66, a verbal comprehension score of 63, a perceptual reasoning score of 82, a working memory score of 77, and a processing speed score of 62. *Id.* Dr. DePace indicated "these scores are felt to represent an accurate assessment of her current level of functioning." *Id.* On the Wide Range Achievement Test–Third Edition ("WRAT–3"), Plaintiff's reading score was at a high school level, her spelling score was at a seventh grade level, and her arithmetic score was at a fourth grade level. Tr. at 430. Dr. DePace noted these scores were higher than anticipated given Plaintiff's full scale IQ score and suggested she "worked very hard in school." *Id.* Dr. DePace noted Plaintiff's full scale IQ score was likely not the best measure of her global intellectual abilities and that her non-verbal abilities were significantly stronger than her verbal abilities and approached the criteria necessary to make a diagnosis of a mixed receptive-expressive language disorder. *Id.* Dr. DePace indicated the following regarding Plaintiff's abilities:

> With regard to activities of daily living, Ms. Lyles reports that she continues to receive some assistance in the management of some higher-order activities of daily living, including managing her own money and she is yet to drive, although she has earned the opportunity to try for her license. She is reported to have numerous age-appropriate friends and was socially appropriate here today. At times, she may be distractible and may seem to lack confidence in engaging in new activities. She does however appear to be able to perform three-step commands, particularly if given an opportunity to repeat them on a couple of occasions. Her concentration appears to be in the Borderline range. Her tolerance for frustration appeared to be fairly appropriate here today. She appeared to put forth appropriate effort during this evaluation.

Tr. at 430–31.

On August 4, 2010, state agency consultant Philip Rosenshield, Ph. D. ("Dr. Rosenshield"), considered Listing 12.02 for organic mental disorders and indicated Plaintiff had receptive-expressive language disorder. Tr. at 434. Dr. Rosenshield assessed Plaintiff to have moderate restriction of activities of daily living, mild difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace. Tr. at 441. Dr. Rosenshield completed a mental residual functional capacity assessment in which he indicated Plaintiff was markedly limited with respect to her abilities to understand and remember detailed instructions and carry out detailed instructions. Tr. at 445. Dr. Rosenshield indicated "[t]he claimant is capable of concentrating sufficiently well to perform simple work tasks in a timely manner without special supervision and adapt to changes in the work setting. Tr. at 447. He further indicated "[s]he has the capacity to interact appropriately with coworkers, supervisors and the general public." *Id.*

On September 7, 2010, Dr. Valite noted Plaintiff was somewhat improved. Tr. at 451. Plaintiff reported she continued to be upset over "little things." *Id.* Plaintiff denied symptoms of psychosis, mania, and suicidal thoughts. *Id.*

On January 6, 2011, state agency consultant Larry Clanton, Ph. D., considered Listings 12.02 for organic mental disorders and 12.04 for affective disorders. Tr. at 453. Dr. Clanton indicated Plaintiff's test results supported language disorder, not a mental retardation diagnosis. Tr. at 454. Dr. Clanton also indicated Plaintiff had bipolar disorder. Tr. at 456. He indicated Plaintiff had mild restriction of activities of daily living, moderate difficulties in maintaining social functioning, and moderate difficulties in

maintaining concentration, persistence, or pace. Tr. at 463. Dr. Clanton indicated Plaintiff's mental symptoms and impairments were severe, but would not preclude the performance of simple, repetitive work tasks in a setting without ongoing interaction with the public. Tr. at 465. Dr. Clanton indicated Plaintiff's abilities to understand and remember detailed instructions, carry out detailed instructions, interact appropriately with the general public, and set realistic goals or make plans independently of others were moderately limited. Tr. at 467–68.

Plaintiff presented to Dara Josiah-Howze, M.D. ("Dr. Josiah-Howze"), for an initial assessment on June 19, 2012. Tr. at 514. She reported that her mother had little time for her and that her stepfather was verbally abusive. *Id.* She indicated she became angry and cried when she thought of her stepfather. *Id.* Dr. Josiah-Howze indicated Plaintiff was irritable, had experienced/witnessed trauma, had instrusive distressing recollections, had recurrent dreams, experienced irritability, was fearful/anxious, and had poor impulse control. Tr. at 517, 519. However, she also indicated Plaintiff was appropriately dressed and groomed, was cooperative, made good eye contact, spoke with normal rate, amplitude, and prosody, was talkative, had a linear and goal-directed thought process, and had normal and future-oriented thought content. Tr. at 519.

On July 5, 2012, Plaintiff reported to Dr. Josiah-Howze that she had a nightmare the previous night and cried for an hour after waking. Tr. at 513. Dr. Josiah-Howze indicated Plaintiff was tolerating Abilify and would start therapy soon. *Id.* She described Plaintiff as appropriately dressed with adequate grooming and hygiene. Tr. at 515. She noted Plaintiff was cooperative, had good eye contact, had normal motor activity, spoke

7

at a normal rate, had a normal thought process and content, and was anxious. *Id.* Dr. Josiah-Howze described Plaintiff's insight/judgment as impaired. Tr. at 516. She diagnosed PTSD and assessed a GAF score of 50. *Id.*

On September 26, 2012, Plaintiff reported to Sherita Davis, M. Ed., LPC ("Ms. Davis"), that her anger was triggered by contact with previous friends, conflicts with family, and negative thoughts about herself. Tr. at 526. Ms. Davis noted that Plaintiff had recently experienced anger outbursts directed toward members of her family. *Id.* On October 10, 2012, Plaintiff reported to Ms. Davis that she had recently experienced several nightmares. Tr. at 524. However, by October 24, 2012, Ms. Davis indicated Plaintiff's nightmares had decreased. Tr. at 523. On October 31, 2012, Plaintiff and Ms. Davis explored distorted thoughts Plaintiff had about herself. Tr. at 522. Ms. Davis described Plaintiff's mood as a calm and her affect as appropriate. *Id.* On November 14, 2012, Plaintiff and Ms. Davis discussed Plaintiff's efforts to control her emotions and Ms. Davis noted Plaintiff had not experienced any anger outbursts since her last session. Tr. at 521. Ms. Davis described Plaintiff's mood as calm and her affect as appropriate. *Id.*

### 3. Educational History

School psychologist Bryan D. Greeson, MA/CAS, NCSP ("Mr. Greeson"), evaluated Plaintiff on November 22, 1994, when Plaintiff was seven years old. Tr. at 337–41. Mr. Greeson indicated the test results were considered "to be a valid estimate of" Plaintiff's "intellectual potential as related to a language-based educational setting." Tr. at 338. Results of the WISC–III indicated Plaintiff was functioning in the educable mentally disabled range. *Id.* She had a verbal IQ of 66, a performance IQ of 55, and a full

8

scale IQ of 57. *Id.* Plaintiff scored in the tenth percentile for reading and below the first percentile for spelling and arithmetic on the Wide Range Achievement Test–Revised ("WRAT–R"). Tr. at 339. Her scores were in the fourteenth percentile for basic reading, the ninth percentile for spelling and math reasoning, the fifth percentile for numerical operations, and the fourth percentile for total mathematics. *Id.* Results of the Developmental Test of Visual-Motor Integration ("VMI") suggested Plaintiff had a developmental age of five years, four months. Tr. at 340. Mr. Greeson interpreted the tests to indicate Plaintiff's limited abilities were not restricted only to the educational environment. *Id.* He recommended Plaintiff be served in the educable mentally disabled resource program. *Id.*

Mr. Greeson reevaluated Plaintiff on September 3, 1998, when she was ten years and nine months old. Tr. at 352–45. He indicated testing presented a valid estimate of Plaintiff's academic achievement and visual-motor development. Tr. at 343. Mr. Greeson referenced WISC–III results dated March 4, 1998, in which Plaintiff was assessed as having a verbal IQ of 69, a performance IQ of 58, and a full scale IQ of 60. *Id.* The Wechsler Individual Achievement Test ("WIAT") was administered on September 3, 1998, and its results indicated Plaintiff was performing on a high first grade level in basic reading, a first grade level in math reasoning, a third grade level in spelling, a high first grade level in reading comprehension, a high second grade level in numerical operations, and a kindergarten level in listening comprehension and written expression. *Id.* Plaintiff's total reading was on a high first grade level; her total mathematics was on a second grade level; and her total writing was on a high second grade level. *Id.* Plaintiff's scores were

equivalent to an age of seven years to seven years, five months and a mid-first grade level on the Bender Visual-Motor Gestalt Test, which suggested she had significant visual-motor difficulties. Tr. at 343–44. On the Vineland Adaptive Behavior Scales Test, Plaintiff's adaptive behavior composite ("ABC") score fell within the borderline to educable mentally disabled range. Tr. at 344. Mr. Greeson noted that Plaintiff continued to be functioning in the educable mentally disabled range of academic aptitude. *Id.*

On April 3, 2001, Plaintiff was assessed as reading and engaging in written expression on a fourth grade level and performing math on an early fifth grade level. Tr. at 346–47. Plaintiff's teachers observed that Plaintiff had progressed in writing, but had difficulty with creativity, grammar, and spelling. Tr. at 347. Plaintiff was described as very cooperative and participating and behaving well, but lacking higher-level reasoning skills. *Id.*

On March 25, 2004, Plaintiff was reading and performing math on a fourth grade level and engaging in written expression on an early fifth grade level. Tr. at 351. Her writing mechanics had improved, but she needed improvement in vocabulary and sentence structure. *Id.* Plaintiff demonstrated weakness in reading comprehension and math applications, but showed strength in math calculation skills and oral comprehension. *Id.* One of Plaintiff's teachers noted Plaintiff needed to work on being focused in class. *Id.*

An individualized education program ("IEP") that reflects a meeting date of March 22, 2006, indicated Plaintiff was enrolled in a regular education environment for 40 to 79 percent of the school day. Tr. at 499. The IEP indicated the following:

> Marisa tries to be a conscientious student who puts forth good effort in her work. She cares about how well she does. She tends to get behind in assignments and doesn't tell anyone until it's crunch time. She is at times very emotional which interferes with her learning. Marissa's [sic] disability affects her progress to a moderate degree in the general curriculum and accommodations are necessary to ensure progress.

Tr. at 502. The report also indicated Plaintiff was reading on a ninth grade level, spelling on a seventh grade level, and performing math on a ninth grade level. *Id.* It showed Plaintiff had difficulty with reading comprehension, deductive reasoning, inference, and problem-solving and required a calculator to perform basic math skills. *Id.*

On March 22, 2007, Plaintiff had completed all but one-and-a-half credits for graduation and had not passed the High School Assessment Program ("HSAP"). Tr. at 354. One of her teachers noted that she needed to increase her grades to pass. *Id.* Another teacher indicated she needed to make up assignments. *Id.* A third teacher indicated Plaintiff did the work, but had difficulty retaining concepts. *Id.* A fourth teacher also expressed concern over Plaintiff's ability to retain concepts. *Id.*

A reevaluation review plan dated May 22, 2007, indicated Plaintiff was graduating with a certificate. Tr. at 356. The plan indicated Plaintiff had completed all course requirements, but had not passed the math portion of the HSAP. Tr. at 358. The report noted that Plaintiff would be attending adult education over the summer to attempt the math portion of the HSAP again. *Id.*

A transition summary of performance report dated May 23, 2007, indicated Plaintiff was reading on a tenth grade level; was a careful reader, had good comprehension skills; had a problem with some phonetics; and was accommodated with

oral testing when needed. Tr. at 332. Plaintiff's math skills were weak and she read on an eighth grade level. *Id.* The report suggested Plaintiff was unable to retain learned concepts, had difficulty with math reasoning skills, and was accommodated through use of a calculator. *Id.* She was able to express her thoughts coherently through written language and had good written language development, but demonstrated problems with mechanics and was accommodated through use of a word processor. *Id.* Plaintiff's written language was indicated to be far below her reading level, but she could communicate her needs appropriately. *Id.* She did not have a driver's license, but was able to find places she needed to go. *Id.* Plaintiff's class participation was good and her note-taking was adequate, but she showed weakness in time management, organization, prioritizing tasks, and study skills. Tr. at 333. She could explain her disability needs with 80 percent efficiency and sought her own assistance. *Id.* Her behavior was socially-appropriate, but she could be emotional. *Id.* Plaintiff served as a trainer for the football team and was considering job opportunities. *Id.* The IEP team recommended Plaintiff seek special education services and tutoring assistance through York Tech. Tr. at 334. The report indicated "[s]he may need assistance with time management and study skills in order to be successful." *Id.*

C.    The Administrative Proceedings

1.    The Administrative Hearing

a.    Plaintiff's Testimony

At the hearing on November 20, 2012, Plaintiff testified she lived with her mother, grandmother, and brother. Tr. at 41. She stated she obtained a high school certificate and a diploma from an adult education program. *Id.* She indicated she was in special education classes while in school. Tr. at 45.

Plaintiff testified she had difficulty remembering things and completing tasks. Tr. at 47. She indicated she did not read for pleasure because she had to read the same thing repeatedly to comprehend it. Tr. at 51. She stated she had applied for a job at Walmart, but was not hired because she failed a preliminary test. Tr. at 48. She indicated she had worked briefly at a library and a jewelry store. Tr. at 48–49. She testified she frequently had to ask where to place the books when she worked in the library. Tr. at 50.

Plaintiff testified she was diagnosed with bipolar disorder. Tr. at 50. She indicated she experienced anger and mood swings, lashed out at others, and experienced symptoms of depression on bad days, which occurred once or twice a week. Tr. at 51–52. She stated she was initially prescribed Depakote, but stopped taking it because it made her sleepy and increased her anger. Tr. at 52–53. Plaintiff indicated she was taking Abilify, which worked well, but that she continued to experience anger and symptoms of depression approximately once a week. Tr. at 53.

Plaintiff testified she was 5'4" tall and weighed 190 pounds. Tr. at 68. She indicated her weight resulted in some problems. *Id.*

Plaintiff testified her grandmother performed most of the household chores, but she helped with laundry and dishes. Tr. at 54. She stated her family usually gave her one task to perform at a time and worked alongside her. *Id.* She indicated she took care of her dogs, but would be unable to work in an animal shelter because she could not take care of many dogs. Tr. at 56. The ALJ proceeded to describe a job volunteering in a shelter and asked Plaintiff if she thought she could perform that job. Tr. at 58. She stated that she could. Tr. at 59. The ALJ then described a job as a companion in a nursing home and asked Plaintiff if she could perform that job. Tr. at 61. Plaintiff indicated she thought she could perform that job. *Id.*

Plaintiff testified she had attended vocational rehabilitation for a couple of months, but stopped attending because of family problems. Tr. at 62–63. She indicated she not have a driver's license because she had failed the written test twice. Tr. at 45. She stated she had a couple of friends that she spoke with daily. Tr. at 56. She indicated one of her friends visited twice a week and they went out to eat or socialized with her family. *Id.* She testified she had attempted to take a Bible course online, but received an incomplete because she was unable to comprehend the material. Tr. at 71–72. Plaintiff indicated she was able to text with her cell phone. Tr. at 73. She stated she attended church weekly, but denied participating in the choir, small groups, or committees. Tr. at 73–74.

b.    Vocational Expert Testimony

Vocational Expert ("VE") Kathryn H. Mooney reviewed the record and testified at the hearing. Tr. at 68–71. The ALJ described a hypothetical individual of Plaintiff's vocational profile who was capable of performing the full range of medium work; should

avoid concentrated exposure to hazards, such as moving machinery and unprotected heights; and was limited to unskilled work with minimal reading. Tr. at 69. The ALJ asked whether there were any other jobs in the region or national economy that the hypothetical person could perform. *Id.* The VE identified medium, unskilled jobs as a laundry laborer, *Dictionary of Occupational Titles* ("*DOT*") number, 361.687-018, with 350 positions in South Carolina and 50,000 positions in the United States; a cook's helper or kitchen helper, *DOT* number 318.687-010, with 3,300 positions in South Carolina and 230,000 positions in the United States; and a hand packer, *DOT* number 920.587-018, with 1,200 positions in South Carolina and 300,000 positions in the United States. Tr. at 69–70.

2.    The ALJ's Findings

In his decision dated January 25, 2013, the ALJ made the following findings of fact and conclusions of law:

1.   The claimant has not engaged in substantial gainful activity since April 9, 2010, the application date (20 CFR 416.971 *et seq.*).
2.   The claimant has the following severe impairments: mixed receptive-expressive language disorder; borderline intellectual disorder; and a mood disorder (20 CFR 416.920(c).
3.   The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).
4.   After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform medium work as defined in 20 CFR 416.967(c) except she should avoid concentrated exposure to hazards such as moving machinery and unprotected heights and is limited to unskilled, simple, routine, and repetitive tasks that require minimal reading.
5.   The claimant has no past relevant work (20 CFR 416.965).

6.    The claimant was born on November 9, 1987 and was 22 years old, which is defined as a younger individual age 18–49, on the date the application was filed (20 CFR 416.963).

7.    The claimant has a limited education and is able to communicate in English (20 CFR 416.964).

8.    Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 416.968).

9.    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969, and 416.969(a)).

10.   The claimant has not been under a disability, as defined in the Social Security Act, since April 9, 2010, the date the application was filed (20 CFR 416.920(g)).

Tr. at 19–29.

II.    Discussion

Plaintiff alleges the Commissioner erred for the following reasons:

1)    the ALJ failed to find Plaintiff disabled under Listing 12.05(C); and

2)    the ALJ's hypothetical to the VE failed to include all of Plaintiff's mental limitations.

The Commissioner counters that substantial evidence supports the ALJ's findings and that the ALJ committed no legal error in his decision.

A.    Legal Framework

1.    The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). Section 423(d)(1)(A) defines disability as:

the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be

16

expected to result in death or which has lasted or can be expected to last for
at least 12 consecutive months.

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following: (1) whether the claimant is engaged in substantial gainful activity; (2) whether she has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[1] (4) whether such impairment prevents claimant from performing PRW;[2] and (5) whether the impairment prevents her from doing substantial gainful employment. *See* 20 C.F.R. § 416.920. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further

---

[1] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. § 416.925. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, she will be found disabled without further assessment. 20 C.F.R. § 416.920(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that her impairments match several specific criteria or be "at least equal in severity and duration to [those] criteria." 20 C.F.R. § 416.926; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

[2] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. § 416.920(h).

inquiry is necessary. 20 C.F.R. § 416.920(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if she can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, § 416.920(a), (b); Social Security Ruling ("SSR") 82-62 (1982). The claimant bears the burden of establishing her inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that she is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987) (regarding burdens of proof).

### 2.    The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings

of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls*, 296 F.3d at 290 (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings and that her conclusion is rational. *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

B.    Analysis

1.    Listing 12.05(C)

Plaintiff argues the ALJ erred in failing to find she was disabled under Listing 12.05(C). [ECF No. 9 at 9]. She maintains the record reflects the presence of an intellectual disability that manifested before age 22. *Id.* at 9–10. She contends the record

contains objective test results that prove she had deficits in adaptive functioning during the developmental period. [ECF No. 12 at 2–3]. She argues the record also contains valid IQ test results between 60 and 70. [ECF No. 9 at 10]. Finally, Plaintiff maintains the record reflects the presence of additional mental impairments that imposed significant work-related limitations. *Id.* at 11–12.

The Commissioner argues the ALJ properly determined Plaintiff's impairment did not meet the stringent requirements for disability under Listing 12.05(C). [ECF No. 11 at 13]. She maintains the evidence supported the ALJ's conclusion that Plaintiff did not demonstrate deficits in adaptive functioning during the developmental period. *Id.* at 14. She argues that, prior to age 22, Plaintiff was able to care for her personal needs and communicate effectively with others. *Id.* at 14–15. The Commissioner argues Plaintiff did not have a valid IQ score of 60 through 70. *Id.* at 16.

"[I]ntellectual disability refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested *during the developmental period*, i.e., the evidence demonstrates or supports onset of the impairment before age 22." 20 C.F.R., Pt. 404, Subpt. P, Appx. 1, § 12.05. To satisfy Listing 12.05(C), the claimant must have both "a valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function." 20 C.F.R., Pt. 404, Subpt. P, Appx. 1, § 12.05(C). To satisfy the requirements of Listing 12.05(C), a claimant must prove that her impairment meets all three prongs for a finding of disability under the Listing: deficits in adaptive functioning during the developmental period, a valid IQ score of 60 through 70,

20

and another physical or mental impairment that causes an additional and significant work-related limitation of function. *See Hancock v. Astrue*, 667 F.3d 470, 475 (4th Cir. 2012). If a claimant fails to satisfy any of these three prongs, a decision that she is disabled is not supported under Listing 12.05(C). *Id.*

The undersigned recommends the court find the ALJ failed to properly consider whether Plaintiff had deficits in adaptive functioning under Listing 12.05(C). The ALJ indicated he considered Listing 12.05. Tr. at 21. He wrote the following:

> The education records from the time period before the claimant turned age 22 indicate she in fact received special education services. Further, she underwent testing at the age of seven and received scores that indicated she was "educable mentally disabled." (Exhibit 18E, p. 10). However, there is no objective evidence of record indicating the claimant was unable to care for her personal needs or communicate with others.

*Id.* Although the record indicated Plaintiff's IQ scores to be in the relevant range prior to age 22, the ALJ concluded that Plaintiff did not demonstrate deficits in adaptive functioning without analyzing evidence that suggested Plaintiff had such deficits. "Deficits in adaptive functioning can include limitations in areas such as communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety." *Jackson v. Astrue*, 467 F. App'x. 214, 218 (4th Cir. 2012), citing *Atkins v. Virginia*, 536 U.S. 304, 309 n.3 (2002). The ALJ considered only whether Plaintiff was unable to care for her personal needs or communicate with others, but the Supreme Court has identified deficits in adaptive functioning as including more than just those two criteria. *See Atkins*, 536 U.S. at 309 n.3. Furthermore, the Supreme Court did not indicate that mental retardation

21

required total inability to function in these areas, but indicated a requirement of "significant limitations" in at least two of the areas in conjunction with significantly subaverage general intellectual functioning. *Id.*

The record contains evidence that suggests Plaintiff had significant limitations in several areas of adaptive functioning prior to age 22. On November 22, 1994, Plaintiff demonstrated scores that were significantly below average in reading, spelling, and math. Tr. at 339. The Developmental Test for VMI indicated Plaintiff's developmental age was nearly two years below her actual age. Tr. at 340. Testing conducted on September 3, 1998, revealed Plaintiff to be functioning significantly below grade-level in basic reading, math reasoning, spelling, reading comprehension, numerical operations, listening comprehension, and written expression and showed her to have significant visual-motor difficulties and an ABC score in the borderline to educable mentally disabled range. Tr. at 343–44. A report dated March 25, 2004, indicated Plaintiff was performing significantly below grade-level and had difficulty focusing. Tr. at 351. An IEP meeting note dated March 22, 2006, indicated Plaintiff "gets behind in assignments," was very emotional at times, and performed below grade-level. Tr. at 502. In July 2006, Plaintiff presented to the emergency department at Piedmont Medical Center because of problems interacting with friends and family members. Tr. at 381. Notes from the visit indicated Plaintiff yelled at friends and family members, kicked out a car windshield, kicked and slammed a door, and threw a telephone. Tr. at 381, 390. An academic note dated March 22, 2007, indicated Plaintiff had difficulty retaining concepts. Tr. at 354. A transition summary of performance dated May 23, 2007, indicated Plaintiff was unable to

retain learned concepts; had difficulty with math reasoning; demonstrated weakness in time management, organization, prioritization, and study skills; and could be emotional. Tr. at 332–33. On August 28, 2009, Dr. Valite indicated Plaintiff's mother had informed him that Plaintiff needed reminders to take medication, engage in personal hygiene, and perform chores. Tr. at 422. He indicated Plaintiff was "a poor candidate to live independently." *Id.* In a function report dated May 3, 2010, Plaintiff's mother indicated Plaintiff had to be reminded to brush her teeth, to bathe thoroughly, to wash and brush her hair, and to take her medication. Tr. at 281–82. She indicated Plaintiff had to be reminded to perform chores and was easily distracted. Tr. at 282. She indicated Plaintiff could not drive and had been unable to pass a driver's test. Tr. at 283. Plaintiff's mother indicated Plaintiff shopped when with family members and was unable to handle money or even count change on her own. *Id.* She wrote that Plaintiff was "easily frustrated and quick to have outburst" while engaging in social activities. Tr. at 285. She indicated Plaintiff could not pay attention for more than 10 minutes at a time and required directions to be provided one step at a time. *Id.* In light of the significant evidence that suggests Plaintiff had deficits in adaptive functioning and the explanation of deficits in adaptive functioning provided by the Supreme Court, the undersigned recommends the court find the ALJ's assessment to be inadequate in this case.

The undersigned further recommends the court find that the ALJ's conclusion regarding Plaintiff's IQ scores is not supported by substantial evidence. The ALJ specifically considered the criteria in paragraph C of Listing 12.05, noting "they are not met because the claimant does not have a valid verbal, performance, or full scale IQ of 60

through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function." Tr. at 22. The ALJ acknowledged Plaintiff to have recorded scores in the relevant range, but cited the Fourth Circuit's decision in *Hancock* as giving him discretion to find those scores invalid. *Id.* The ALJ explained his conclusion as follows:

> Similarly, in this case, the undersigned finds the June 2010 scores invalid when considered in conjunction with the remaining evidence of record including her work history and activities of daily living. Initially, the undersigned notes that the consultative evaluator, A. Nicholas DePace, Ph. D., indicated that he did not feel that the full-scale IQ score was the best measure of her global intellectual abilities. (Exhibit 6F, p. 3). Specifically, he noted the discrepancy between all of her scores, in that she received much higher scores in perceptual reasoning (82) and working memory index (77). (Exhibit 6F, p. 3). He, therefore, concluded that her nonverbal abilities are "significantly stronger" than her verbal abilities and approach[ed] the criteria necessary for a diagnosis of "mixed receptive-expressive language disorder." (Exhibit 6F, p. 4). Further, he noted that she demonstrated numerous difficulties with her speech on several occasions, as she used incorrect grammar and misarticulated words to express her thoughts. (Exhibit 6F, p. 5). This evidence suggests the claimant has a learning disorder versus mental retardation.

*Id.*

In *Hancock*, the Fourth Circuit held that "an ALJ has the discretion to assess the validity of an IQ test result and is not required to accept it even if it is the only such result in the record." 667 F.3d at 474. The court considered language in the introductory section to Listing 12.00 that provides the following "since the results of intelligence tests are only part of the overall assessment, the narrative report that accompanies the test results should comment on whether the IQ scores are considered valid and consistent with the

developmental history and degree of functional limitation." *Id.*, citing 20 C.F.R. Pt. 404, Subpt. P, App'x 1, § 12.00(D)(6)(a).

Although the ALJ correctly maintained that the Fourth Circuit's decision in *Hancock* allows ALJs to find IQ test scores invalid where they are not supported by the narrative report and record, the record in this case does not support the ALJ's decision to invalidate Plaintiff's IQ test scores. The record reflects three assessments of Plaintiff's IQ conducted between 1994 and 2010. *See* Tr. at 338, 343, 429. The results from all three tests indicated that the results were valid and reflected IQ scores below 70. *See id.* On June 29, 2010, at age 22, Plaintiff underwent an IQ test administered by Dr. DePace, who assessed a verbal IQ score of 63, a perceptual reasoning score of 82, a working memory score of 77, a processing speed score of 62, and a full scale IQ score of 66. Tr. at 429. Dr. DePace indicated "these scores are felt to represent an accurate assessment of her current level of functioning," but "[b]ecause of the significant differences between these scores, her obtained Full Scale IQ score is likely not the best measure of her global intellectual abilities." *Id.* Dr. DePace's report is confusing because it both indicates Plaintiff's IQ scores to be valid and suggests that Plaintiff's full scale IQ is not the best measure of her intellectual abilities. The ALJ relied on the second half of Dr. DePace's statement in finding that Plaintiff did not have a valid IQ between 60 and 70, but neglected to address Plaintiff's valid verbal IQ score of 63. *See* Tr. at 429. "In cases where more than one IQ is customarily derived from the test administered, e.g., where verbal, performance, and full scale IQs are provided in the Wechsler series, we use the lowest of these in conjunction with 12.05." 20 C.F.R. Pt. 404, Subpt. P, App'x 1 § 12.00(D)(6)(c).

Therefore, even if Plaintiff's full scale IQ is considered invalid, the record still contained a presumably valid IQ score between 60 and 70 in the form of Plaintiff's assessed verbal IQ. In explaining his decision to discount Plaintiff's full scale IQ, the ALJ cited reasons that bolster the validity of Plaintiff's verbal IQ score, noting that Plaintiff's nonverbal abilities were stronger than her verbal abilities, that she demonstrated numerous difficulties with her speech on several occasions, and that she used incorrect grammar and misarticulated words to express her thoughts. *See* Tr. at 22. In light of the ALJ's failure to address Plaintiff's verbal IQ score that fell within the requisite range and Plaintiff's history of IQ scores within a similar range, the undersigned recommends the court find that the ALJ's decision to invalidate Plaintiff's IQ test scores was not supported by substantial evidence.

The undersigned further recommends the court find the ALJ failed to adequately assess the third prong of Listing 12.05(C). The ALJ concluded that Plaintiff did not meet the requirements of Listing 12.05(C) because she did not have a valid verbal, performance, or full scale IQ of 60 through 70 and another impairment that imposed an additional and significant work-related limitation of function. Tr. at 22. Although he explained his reasons for concluding Plaintiff did not have a valid IQ in the requisite range, he did not explain his conclusion regarding the effects of Plaintiff's other impairments. Because the ALJ found Plaintiff had multiple severe impairments, he is required to determine whether any of Plaintiff's additional impairments imposed additional and significant work-related limitations of function. 20 C.F.R., Pt. 404, Subpt. P, App'x 1, § 12.05(C).

2.      Hypothetical Question Presented to VE

Plaintiff argues the ALJ failed to set forth a hypothetical to the VE that included all of her mental limitations. [ECF No. 9 at 12]. Plaintiff contends that, in restricting her to unskilled work with minimal reading, the ALJ failed to properly consider her moderate difficulties in concentration, persistence, or pace. *Id.* Plaintiff also maintains that the ALJ's failure to include in the hypothetical restrictions to simple, routine, repetitive tasks and reliance on the jobs identified without those additional restrictions was not harmless error because it deprived her of the ability to challenge the sufficiency of the evidence. [ECF No. 12 at 4–5].

The Commissioner argues the ALJ's error in failing to include resctrictions to "simple, routine, repetitive" tasks in his hypothetical question to the VE was harmless, and that the identified jobs could be performed with those additional restrictions. [ECF No. 11 at 19–20].

At step five of the sequential evaluation process, the Commissioner bears the burden of providing evidence of a significant number of jobs in the national economy that a claimant could perform. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). The purpose of bringing in a VE is to assist the ALJ in determining if the Commissioner has met this burden. *Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989). For a VE's opinion to be relevant, "it must be based upon a consideration of all other evidence in the record" and "must be in response to proper hypothetical questions which fairly set out all of claimant's impairments." *Id.*; *see also Johnson*, 434 F.3d at 659; *English v. Shalala*, 10 F.3d 1080, 1085 (4th Cir. 1993). An ALJ has discretion in framing hypothetical questions

as long as they are supported by substantial evidence in the record, but the VE's testimony cannot constitute substantial evidence in support of the Commissioner's decision if the hypothesis fails to conform to the facts. *See Swaim v. Califano*, 599 F.2d 1309, 1312 (4th Cir. 1979).

The Fourth Circuit recently held that "an ALJ does not account 'for a claimant's limitations in concentration, persistence, or pace by restricting the hypothetical question to simple, routine tasks or unskilled work.'" *Mascio v. Colvin*, No. 13-2088, 2015 WL 1219530, at *5 (4th Cir. March 18, 2015), citing *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1180 (11th Cir. 2011). The court further explained "the ability to perform simple tasks differs from the ability to stay on task" and "[o]nly the latter limitation would account for a claimant's limitation in concentration, persistence, or pace." *Id.*

In evaluating the criteria under Listing 12.00, the ALJ determined Plaintiff had moderate difficulties in concentration, persistence, or pace. Tr. at 20, 27. He found the claimant was "capable of performing the demands of unskilled, simple, routine, and repetitive tasks that require only minimal reading." Tr. at 27.

The undersigned recommends the court find the VE's testimony does not constitute substantial evidence in support of the Commissioner's decision. The ALJ neglected to include a limitation to simple, routine, and repetitive work in the hypothetical question posed to the VE, but he included those limitations in his assessment of Plaintiff's RFC and relied on the jobs identified by the VE to the incomplete hypothetical. *Compare* Tr. at 23 and 29, *with* Tr. at 68–69. Although the Commissioner argues the jobs identified by the VE would allow for the restriction to simple, routine,

and repetitive work, that conclusion is not apparent from the administrative record. In addition, the ALJ found that Plaintiff had moderate difficulties in concentration, persistence, or pace, but did not impose restrictions in the hypothetical to the VE or assess restrictions in the RFC that adequately reflected that finding. Therefore, the undersigned recommends the court find that the Commissioner failed to satisfy her burden at step five because the ALJ did not pose a hypothetical question to the VE that considered all evidence in the record and fairly set forth all of Plaintiff's impairments.

III.    Conclusion and Recommendation

The court's function is not to substitute its own judgment for that of the ALJ, but to determine whether the ALJ's decision is supported as a matter of fact and law. Based on the foregoing, the court cannot determine that the Commissioner's decision is supported by substantial evidence. Therefore, the undersigned recommends, pursuant to the power of the court to enter a judgment affirming, modifying, or reversing the Commissioner's decision with remand in Social Security actions under sentence four of 42 U.S.C. § 405(g), that this matter be reversed and remanded for further administrative proceedings.

IT IS SO RECOMMENDED.

April 7, 2015                                                Shiva V. Hodges
Columbia, South Carolina                      United States Magistrate Judge

**The parties are directed to note the important information in the attached "Notice of Right to File Objections to Report and Recommendation."**

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
901 Richland Street
Columbia, South Carolina 29201

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).